# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| Yvette Bailey and Kenneth Romer,<br><br>         Plaintiffs,<br><br>    v.<br><br>Santander Bank, N.A., Mary Jane Cavanaugh, and Cavanaugh Appraisals, LLC,<br><br>         Defendants. | Civil Action No.: |

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1. Plaintiffs Dr. Yvette Bailey and Kenneth Romer, Esq. bring this action for damages, injunctive relief, and declaratory relief against Defendants Santander Bank, N.A., Mary Jane Cavanaugh, and Cavanaugh Appraisals, LLC, to seek redress for violations of Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and the Connecticut Discriminatory Practices Act, C.G.S. § 46a-51 *et seq.*

2. The Cavanaugh Defendants discriminated against Plaintiffs by dramatically undervaluing their home in an appraisal because of Plaintiffs' race. Defendant Santander discriminated against Plaintiffs by knowingly relying on that appraisal to deny Plaintiffs a refinance loan, and by failing to maintain any supervision or review process over appraisals when discrimination complaints are made.

3. Plaintiffs' home at 58 Highgate Drive in Avon is a large home, with approximately 7,000 square feet of above-grade living area with a 4-car attached garage and a 3-car built in garage on a 7.39 acre double lot that backs up against Horse

Guard State Park, a 105-acre state park. Avon, as well as Plaintiffs' neighborhood, are predominantly white, with black people making up less than 1% of the town's population. The median home value is 40% more than the statewide median home value. Plaintiffs' purchased their home in 2002 for $675,000 and made substantial alterations to the property after that time.

4. Dr. Bailey is black, and Attorney Romer is white. They have two mixed-race children who present as black and were present during the discriminatory appraisal.

5. Plaintiffs applied to Defendant Santander on September 25, 2020, to refinance their existing mortgage debt and take advantage of historically low interest rates. Santander approved their application for a loan with a 2.625% interest rate and $745,000 principal amount, subject to confirming the value of the home with an appraisal. Santander's loan officer believed the home was likely valued between $1.2 and $1.7 million.

6. Santander contracted with the Cavanaugh Defendants for the appraisal.

7. On January 27, 2021, Cavanaugh conducted the appraisal. She spent about 10 minutes in the property and left when her camera ran out of memory to take photos. Most of the comparable properties she selected were further from the subject property than necessary; the only in-neighborhood comp was half the size, on a lot 1/7th the size, with less than half the number of garage spaces – one comparable even sold pre-pandemic, where home pricing was drastically different. She valued the additional acres about $5,000 each, which is drastically low for Avon, and realistically drastically low for much of Hartford Country; she also ignored that Plaintiffs have a second

approved building lot on their land. She ignored about 900 square feet of living area, as well as one full bathroom. In order to arrive at her valuation, Cavanaugh had to make sizeable adjustments to the comparable homes, which she largely justified based on the presence of brick façades on the other homes, a feature that is not particularly more expensive relative to other siding types and is at most a buyer preference.

8. The Cavanaugh Defendants appraised the home for $780,000. Santander denied Plaintiffs' loan application because of the low valuation. Plaintiffs were shocked at the appraisal and submitted a written objection as well as verbally conveyed their view that race played a factor in the discrimination. Plaintiffs' loan officer agreed with the Plaintiffs that he felt race played a factor in the appraisal.

9. Santander handled Plaintiffs' appeal by forwarding it to the Cavanaugh Defendants for review, rather than rightly recognizing that it was infected by discrimination and sending it for a new appraisal.

10. The Cavanaugh Defendants' appraisal and interactions with Plaintiffs are consistent with a pattern of discriminatorily undervaluing homes.

11. Plaintiffs' loan officer communicated to Plaintiffs that he had 3-5 additional clients who had appraisals that were undervalued due to discrimination, but Santander failed to take a reasonable approach to reviewing them. He also conveyed that one of his colleagues was having similar issues with Santander's appraisal review department. Lastly, Plaintiffs' loan officer conveyed the discrimination allegations to his immediate manager, who refused to take additional steps to respond to the complaint.

12. In March 2021, when it became clear to Plaintiffs that Santander would not be doing anything about their complaint, they applied to another lender to refinance their

mortgage debt. They "whitewashed" the house prior to the appraisal by removing family photos and any artwork that would be associated with black culture. This time, neither Dr. Bailey nor her two children, both of whom present as black, were present. Only Attorney Romer, who is white, walked through the appraisal.

13. The home appraised for $1.2 million, consistent with Plaintiffs' prior loan officer's view.

## PARTIES

14. Plaintiffs Dr. Yvette Bailey and Attorney Kenneth Romer live at 58 High Gate Drive, Avon, Connecticut, are married, and have two children ages 18 and 23.

15. Dr. Bailey is board certified radiologist and Attorney Romer has been practicing law for 24 years.

16. Defendant Mary Jane Cavanaugh is licensed as a Real Estate Appraiser, by the state of Connecticut, and has been since 2006 (State Certification # RCR.0001426). She is the sole member and principal of Cavanaugh Appraisals, LLC. Defendant Cavanaugh personally conducted the discriminatory appraisal at issue in this case.

17. Defendant Cavanaugh Appraisals is a Connecticut limited liability company with a principal place of business located at 50 Simmons Street, Torrington, CT 06790.

18. Defendant Santander Bank, N.A. is a Massachusetts-based national association engaged in personal and business banking with a principal place of business at 75 State Street, Boston, Massachusetts, 02109.

19. Santander's business is subject to laws that regulate the method by which appraisals are ordered and reviewed and its interactions with appraisers.

20. In acting or failing to act as alleged herein, each corporate defendant acted through its employees and/or agents and is liable for the acts and omissions of its employees and/or agents.

21. In acting or failing to act as alleged herein, each employee or officer of each corporate defendant was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by each corporate defendant as principal.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 3613. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

23. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants conduct business in or are residents of the District and a substantial part of the events or omissions giving rise to the claims occurred within this District.

## FACTUAL BACKGROUND

**A.    Property Background**

24. Plaintiffs' home is a large, mostly custom home in a small neighborhood in Avon. It is approximately 7,000 square feet with 7 garage spaces on a 7.39 acre double lot that backs up against Horse Guard State Park, a 105-acre state park. It has 7 bedrooms, five full bathrooms and one half bathroom.

25. Plaintiffs originally purchased their home in 2002 for $675,000 with a mortgage of $607,500.

26. In January 2019, Plaintiffs took out a second mortgage of $298,500.

27. After purchasing the home, Plaintiffs made substantial renovations to it as well as an addition. They spent over $500,000 to have the following built:

- Six car auto salon with a three-bedroom suite, full bathroom, and laundry room built above it.

- A spa room built with clear tongue and groove pine paneling with no nail holes, custom detailed tile work surrounded by wall-to-wall carpeting, and a 7.5-foot sliding door to accommodate removal of spa should it ever be necessary.

- 750 square-foot Ipe deck, adjacent to the spa room.

- Custom light fixtures in the spa room and on the deck, as well as custom track lights in the spa room built into the 6" x 6" exposed beams.

**B. Defendant Santander denied Plaintiffs' refinance because of a low appraisal conducted by Defendant Cavanaugh.**

28. In late 2020, interest rates on residential mortgages were at a historic low. Plaintiffs wanted to take advantage of the low rates and either reduce their monthly mortgage payment by consolidating their two mortgages and obtaining a significantly lower interest rate, or maintain their monthly mortgage payment, but reduce the term of their mortgage debt from 30 years on their first and 20 years on their second, to a consolidated 15-year mortgage.

29. Plaintiffs had an existing relationship with Santander and viewed the bank as a reliable partner.

30. Plaintiffs' main contact with Defendant Santander was a loan officer who works across Connecticut, but has substantial experience in the Avon area as well.

6

After reviewing Plaintiffs' application materials, their loan officer told them he believed they would be approved. He provided them with an unofficial estimate of value of between $1.2 and $1.7 million.

31.     The loan officer knew the race and national origin of both Plaintiffs.

32.     Upon information and belief, after receiving the application, Santander issued a preliminary loan approval and requested an appraisal.

33.     On January 27, 2021, Defendant Cavanaugh conducted the appraisal of the home. At the time of the appraisal, Dr. Bailey and her children were home, and the Plaintiffs had family photos displayed around the home as well as African art.

34.     On February 2, 2021, Defendant Cavanaugh delivered the appraisal to Santander and reported that the "indicated value by sales comparison approach" of the property was $780,000.

35.     Shortly thereafter, Santander denied Plaintiffs' loan application because of the low valuation.

**C.     Because it was infected by racial discrimination, Defendant Cavanaugh's appraisal was flawed.**

36.     To appraise Plaintiffs' home, Defendant Cavanaugh used the sales comparison approach. In this common appraisal method, an appraiser assesses the value of a home by identifying recent sales prices of similar homes in the area, called "comparables" or "comps." The rationale underlying this approach is that the sales prices of comparable properties from the same neighborhood from a similar time period are considered the best indicator of value. However, it simultaneously presents significant fair lending risks, as appraisers have broad discretion in selecting comps and establishing neighborhood boundaries, which opens the door for discrimination.

37. As explained below, Cavanaugh's undervaluation of Plaintiffs' home reflected her belief that, because they are a mixed-race couple, the Plaintiffs did not belong in Avon, an attractive and predominantly affluent, white town. Cavanaugh's undervaluation also reflected her belief that Plaintiffs' home is worth less than other homes in Avon because the homeowners are a mixed-race couple. Because of these discriminatory beliefs, Cavanaugh did not follow proper and well-established appraisal standards including searching for and selecting similar nearby homes to use as comparables. Instead, Cavanaugh arbitrarily selected comps beyond the customary one-mile radius, selected comps that sold prior to the pandemic housing market boom, and further improperly devalued the comps she selected.

38. Appraisers may adjust the value of comparables to account for differences in value associated with features not shared between the subject home and comparables. For example, an appraiser may adjust the sales price of a comp upward if the subject home has more bathrooms than the comp or downward if it has fewer bathrooms (the rationale being that the houses are otherwise similar, but the likely sales price of one will be higher if it has additional bathrooms).

39. Cavanaugh made unjustifiably large negative adjustments to the sales prices of comps. She also failed to make sufficient adjustments to account for positive aspects of the Plaintiffs' home not shared by the comps.

40. Cavanaugh engaged in the following improper adjustments:

  a. A gross adjustment of $5,000 per acre, therefore substantially undervaluing the Plaintiffs' large, double lot without reference to the market's treatment of similar sized lots, in violation of the Fannie Mae Selling Guide;

    b. The only home selected with a comparable lot and gross living area sold for $1,010,000 in September of 2019, but by the time Cavanaugh appraised Plaintiffs' home median prices had risen by over 6%;[1]

    c. Cavanaugh did not justify her use of a comp that sold more than 12 months prior to the appraisal;

    d. Although there were comparables on larger lots closer than 2 miles that had sold recently, Cavanaugh expanded her geographic reach to pick up homes that had sold for less money on smaller lots;

    e. The majority of improper adjustments made by Cavanaugh are concealed through her use of "C" and "Q" rates:

        i. She applied a Q3 rating to the Plaintiffs' home, a 10% downward adjustment, but such ratings are intended for stock homes located on above-average residential development tracks, rather than the Q2 rating appropriate for semi-custom homes with "detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail" per the Fannie Mae and Freddie Mac Uniform Mortgage Data Program;

        ii. She applied a C3 rating to the Plaintiffs' home, a 10% downward adjustment, but such ratings are reserved for homes still in their first cycle "of replacing short-lived building components (appliances, floor coverings, HVAC, etc.)" even though Plaintiffs had replaced all of those components with high end components, and there was little or no deferred maintenance.

41. While Cavanaugh alleged that there were no comparables in the one-mile radius, she nevertheless selected a grossly inferior comp from the neighborhood that had sold for $512,500. While she acknowledged it was inferior, it had a sale price of $146.14 per square foot. She estimated the value of the Plaintiffs' home at $145.74 per square foot – less than a comp she thought was inferior. She applied gross and net adjustments of 54% to this property, suggesting that it was not a truly comparable sale.

---

[1] September 2019 median price $312,928, January 2021 median price $332,198 per Zillow.com.

9

42. In order to arrive at her devalued appraisal, Cavanaugh also applied gross percentage adjustments inconsistently. For instance, for Comps 1, 3, and 5, she assigned a Q2 rating and adjusted the price by 10%. She also applied a Q2 rating for Comp 4, but because this property had sold for substantially more than the other Q2 properties, she applied a 20% adjustment.

43. Conversely, Cavanaugh did not assign positive credit for the improvements Plaintiffs made to their home and incorrectly stated that there had been no updates to the home in the previous fifteen years. She also gave Plaintiffs insufficient credit for finished rooms below grade, and ignored about 900 square feet of living area and one full bathroom. Accepting her $145 per square foot valuation of the home, the 900 square feet Cavanaugh omitted would have increased the home value by $130,500. Cavanagh included the following comments in her appraisal:

   a. "The addition is somewhat separated from the main dwelling living area, and can be accessed through the front entrance of the addition, or the interior access which is through the 2nd floor spa room connected to the master bedroom on the 2nd floor, not an optimal access for nearby bedrooms; Therefore, although they are technically bedrooms, access to them is somewhat non traditional; In addition, a total bedroom count of 8 bedrooms is above market expectation and minimal value is given for the extra bedrooms; As seen by the comparable sales, 4-5 bedrooms in this market sector is typical; The rooms in the addition are currently being used as office space."

   b. "Also, the total garage count is 7 bays; The addition has 4 bays in the basement garage and main dwelling has 3 Car Attached garage; Market expectation is 3 bays, therefore, the additional bays are given minimal value and may be a feature that is buyer specific; Their access is somewhat limited under the addition as can be seen from the photos."

44. These comments demonstrate that Cavanaugh was valuing the home as a typical Avon home limited to homes in the 4-5 bedroom "market sector" and not as a custom luxury home with unique and valuable features.

45. There is no race-neutral or legitimate business justification for Defendant Cavanaugh's decisions in appraising Plaintiffs' home. Defendant Cavanaugh significantly underappraised the Plaintiffs' home because of discrimination against Plaintiffs. Specifically, she did so because they are a mixed-race couple in a generally white neighborhood. This discrimination is apparent based on Cavanaugh's actions and demeanor in dealing with Plaintiffs; her refusal to select appropriate comps, in contravention of proper appraisal standards; her excessive downward adjustments to the homes she selected as comparables; and her failure to make appropriate upward adjustments based on the condition and features of the Plaintiffs' home.

**D.    Defendant Santander knowingly relied on Defendant Cavanaugh's flawed appraisal.**

46. On February 17, 2021, shocked at the appraisal, Plaintiffs submitted a written objection to their loan officer at Santander, and verbally conveyed their view that race played a factor in the valuation of the property and that they had been discriminated against by the Cavanaugh Defendants. The Plaintiffs' loan officer agreed with the Plaintiffs that he felt race played a factor in the appraisal. Upon information and belief, the Plaintiffs' loan officer identified to the Plaintiffs additional individuals who he believed were discriminated against by Santander's chosen appraisers.

47. Santander handled the Plaintiffs' appeal by forwarding it to the Cavanaugh Defendants for review, rather than rightly recognizing that it was infected by discrimination and sending it to a new appraiser for a second appraisal. Cavanaugh affirmed her prior appraisal and refused to make even technical corrections to it.

**E.      Plaintiffs obtained alternative financing by whitewashing their home.**

48.     On or about March 15, 2021, when it became clear to Plaintiffs that Santander would not be doing anything about their complaint, they applied for a loan with Northwest Community Bank to refinance their mortgage debt.

49.     Plaintiffs were again approved pending appraisal for a refinance loan at a 2.5% interest rate.

50.     Plaintiffs were contacted by James Boothroyd of Resources Development Associates to conduct the appraisal of their home.

51.     Based on their experience with Defendant Cavanaugh and their understanding of the realities of mortgage discrimination, Plaintiffs made the difficult decision to conduct a "whitewashing" experiment on their home prior to Boothroyd's appraisal.

52.     "Whitewashing" is where a black homeowner removes markers of black identity, such as family photographs, from their home and enlists a white person to stand in as the homeowner when an appraiser is present, thereby making it seem to the appraiser that the house is owned by white people. Black homeowners regularly see valuations of their homes increase appreciably under whitewashing experiments. The increased prevalence of whitewashing is responsible for raising awareness of appraisal discrimination.

53.     Before the appraisal, Plaintiffs removed family photographs and other markers of black identity from their home.

54.     Plaintiffs felt embarrassment, humiliation, and anger that they had to carry out this experiment.

55. Mr. Boothroyd conducted the appraisal on May 7, 2021. Consistent with their whitewashing experiment, however, neither Plaintiffs' children nor Dr. Bailey were home. Instead, Attorney Romer alone greeted Mr. Boothroyd and was present throughout the walk through. By all appearances, Plaintiffs' home was owned by white people.

56. Mr. Boothroyd appraised Plaintiffs' home for $1,200,000. That valuation is $420,000 more—and nearly 54% higher—than Defendant Cavanaugh's appraisal less than 4 months prior.

57. Plaintiffs made no significant improvements in their home in the interim, and although median home prices in Avon had meaningfully changed since Defendant Cavanaugh's appraisal, Boothroyd actually concluded that the market for luxury homes such as the Plaintiffs' had declined by 5.5% in that area.

58. Mr. Boothroyd's appraisal confirms that Defendant Cavanaugh's appraisal was grossly inconsistent with appraisal guidelines and principles and that her excuses for devaluing the Plaintiffs' home were invalid and pretextual.

59. On June 11, 2021, following Mr. Boothroyd's appraisal, Plaintiffs refinanced $760,000 and consolidated their mortgages through Northwest Community Bank. In doing so, they reduced both the term and interest rate of their mortgages.

**F.   Injury to Plaintiffs**

60. Plaintiffs' experience is emblematic of systemic appraisal discrimination in the United States. Studies show there is a measurable and pervasive "appraisal gap," whereby homes owned by people of color or located in neighborhoods of color are more

likely to be appraised below an agreed upon sales prices than are similar homes owned by white people or owned by white borrowers.[2]

61. The harm caused by appraisal discrimination to minority families and society at large is staggering. This discrimination prevents people and families of color from being able to purchase homes and access the equity in the homes they already own, thus preventing them from building generational wealth via homeownership, as so many Americans have done, and contributing to the nation's racial wealth gap.

62. Plaintiffs have suffered similar harm due to the appraisal discrimination caused by Santander Bank and the Cavanaugh Defendants.

63. The Cavanaugh Defendants intentionally engaged in discriminatory practices in appraising Plaintiffs home, including by (1) arbitrarily selecting comparables beyond the customary one-mile radius or that sold prior to the pandemic housing market boom, (2) ignoring 900 square feet of living space and one bathroom, and, finally, (3) further depressing the appraisal by making unjustifiable adjustments that further devalued the Plaintiffs home.

64. Defendant Cavanaugh did so because of her beliefs that Dr. Bailey and Attorney Romer, a mixed-race couple, did not belong in Avon, an attractive and predominantly affluent, white town. Cavanaugh's undervaluation also reflected her belief that Plaintiffs' home is worth less than other homes in Avon because the homeowners are a mixed-race couple.

---

[2] Melissa Narragon, et al., Racial and Ethnic Valuation Gaps in Home Purchase Appraisals, Freddie Mac (Sept. 20,2021), https://www freddiemac.com/research/insight/20210920-home-appraisals.

65. Defendant Cavanaugh's discrimination prevented Dr. Bailey and Attorney Romer from realizing the benefit of their home's true value and obtaining a loan the loan they had negotiated with Santander, which would have reduced both their interest rate and loan term. As a result of Defendant Cavanaugh's discriminatory appraisal and the resulting denial of their loan, the Plaintiffs had to expend significant time and effort to reapply for a new loan and whitewash their home for appraisal.

66. The Cavanaugh Defendants' actions also caused Plaintiffs significant emotional distress, including humiliation and embarrassment, arising from being subject to discrimination and having to whitewash their own home.

67. Defendant Santander Bank injured Plaintiffs by relying on Defendant Cavanaugh's discriminatory appraisal to deny the Plaintiffs' loan despite the fact it knew or should have known that the appraisal was racially discriminatory—it was an obvious and egregious undervaluation of the Avon home and Plaintiffs notified their loan officer at Santander that they understood the valuation to be caused by racial discrimination. This injury was compounded by Santander's refusal to meaningfully investigate or respond to the Plaintiffs' appeal of the appraisal. Instead, Santander handled the Plaintiffs' appeal by forwarding it to the Cavanaugh Defendants for review, rather than rightly recognizing that it was infected by discrimination and sending it to a new appraiser for a second valuation. As a result, Plaintiffs were unable to realize the benefit of their home's true value and expended significant time and effort to reapply for a new loan and whitewash their home.

68. Defendant Santander further injured Plaintiffs by causing them significant emotional distress, including humiliation and embarrassment, arising from being subjected to discrimination and having to whitewash their own home. Defendants' actions were willful and/or taken in reckless disregard of the civil right of the Plaintiffs.

## CAUSES OF ACTION

### Count I – Violation of the Fair Housing Act
### 42 U.S.C. § 3601, *et seq.*

69. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 68 above.

70. Defendants' conduct, as alleged herein, violates multiple provisions of the Fair Housing Act. Specifically, Defendants have engaged in the following discriminatory housing practices:

   a) Discrimination in the terms, conditions, or privileges of a sale of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, or national origin, in violation of 42 U.S.C. § 3604(b);

   b) Discrimination in making available a residential real estate-related transaction, or in the terms or conditions of such a transaction, because of race, color, or national origin, in violation of 42 U.S.C. § 3605;

   c) Coercion, intimidation, threats, or interference with persons in the exercise or enjoyment of, or on account of their having exercised or enjoyed, their rights under Section 3604 of Title 42, in violation of 42 U.S.C. § 3617.

71. Accordingly, Plaintiffs are "aggrieved persons" as defined in 42 U.S.C § 3602(i) and are entitled to relief under 42 U.S.C § 3613(c).

### COUNT II – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*

72. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 68 above.

73. Defendant Santander Bank is a "creditor" within the meaning of 15 U.S.C. § 1691a(e).

74. Defendant Santander Bank's conduct, as alleged herein, constitutes discrimination with respect to aspects of a credit transaction on the basis of race, color, or national origin, in violation of 15 U.S.C. § 1691(a)(1).

75. Accordingly, Plaintiffs are aggrieved applicants who are entitled to relief under 15 U.S.C. § 1691(a)(1).

### COUNT III – Violation of the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982

76. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 68 above.

77. In acting as alleged herein, Defendants have injured Plaintiffs by impairing their right to make and enforce contracts and to the full and equal benefit of the laws for security of property as is enjoyed by white citizens, in violation of 42 U.S.C. §§ 1981 and 1982.

78. Accordingly, Plaintiffs are entitled to relief under 42 U.S.C. §§ 1981,1982 and 1988(a).

### COUNT IV - Connecticut Discriminatory Practices Act, Conn. Gen. Stat. § 46a-51 *et seq.*

79. Plaintiffs reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 68 above.

80. Defendants' conduct, as alleged herein, violates multiple provisions of Connecticut's fair housing laws. Defendants have engaged in the following discriminatory housing practices:

   a) Discrimination against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, creed, color, national origin, ancestry, sex, gender identity or expression, marital status, age, lawful source of income, familial status or status as a veteran. Conn. Gen. Stat. § 46a-64c(a)(2).

   b) Discrimination by a creditor on the basis of sex, gender identity or expression, age, race, color, religious creed, national origin, ancestry, marital status, intellectual disability, learning disability, blindness, physical disability or status as a veteran against any person eighteen years of age or over in any credit transaction. Conn. Gen. Stat. § 46a-66(a).

81. Accordingly, Plaintiffs are entitled to relief under Conn. Gen. Stat. §§ 46a-64c and 46a-66.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant judgment in their favor, and against Defendants as follows:

1) Declare that Defendants have violated the provisions of applicable federal and state laws;

2) Permanently enjoin Defendants from engaging in the conduct described herein, either directly or through others;

3) Order Defendants to take appropriate affirmative actions to ensure that the conduct described herein is not engage in by them again;

4) Award compensatory damages to Plaintiffs in an amount determined by a jury that would fully compensate them for the injuries caused by Defendants' conduct alleged herein;

5) Award punitive damages to Plaintiffs in an amount to be determined by a jury that would punish Defendants for the willful, wanton, and reckless conduct alleged that would effectively deter similar conduct in the future;

6) Award reasonable attorneys' fees and costs; and

7) Award such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

Respectfully submitted,

Plaintiffs Yvette Bailey and
Kenneth Romer

/s/ Loraine Martinez Bellamy
Loraine Martinez Bellamy (ct29220)
David Lavery (ct29971)
Jeffrey Gentes (ct28561)
Connecticut Fair Housing Center
60 Popieluszko Court
Hartford, CT 06106
Tel.: 860-263-0732
Fax: 860-247-4236
lmartinez@ctfairhousing.org
jgentes@ctfairhousing.org
